# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 22, 2016                    Decided June 3, 2016

No. 15-5070

FRIENDS OF ANIMALS,
APPELLANT

v.

SALLY JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF
INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00357)

———

*Michael Ray Harris* argued the cause for appellant. With
him on the briefs was *Jennifer E. Barnes.*

*Robert H. Oakley*, Attorney, U.S. Department of Justice,
argued the cause for federal appellees. With him on the brief
were *John C. Cruden*, Assistant Attorney General, and
*Andrew C. Mergen* and *Matthew Littleton*, Attorneys. *Nina C.
Robertson*, Attorney, entered an appearance.

*Anna M. Seidman*, *Douglas S. Burdin*, and *Jeremy E.
Clare* were on the brief for defendant-intervenor-appellee
Safari Club International.

Before: KAVANAUGH, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Senior Circuit Judge* SENTELLE.

EDWARDS, *Senior Circuit Judge*: Section 9 of the Endangered Species Act of 1973 ("Act" or "ESA"), 16 U.S.C. § 1531 *et seq*., makes it unlawful "for any person subject to the jurisdiction of the United States to," *inter alia*, "take" any endangered species within the United States or "possess, sell, deliver, carry, transport, or ship, by any means whatsoever" any endangered species "taken" in violation of the Act. 16 U.S.C. § 1538(a)(1)(B), (D). Under the Act, "take" means "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Section 10 of the Act authorizes the Secretary of the Interior, who has delegated his authority to the Fish and Wildlife Service ("FWS" or "Service"), to, *inter alia*, "permit . . . any act otherwise prohibited by [Section 9] for scientific purposes or to enhance the propagation or survival of the affected species." *Id.* § 1539(a)(1)(A). Section 10 also requires the Secretary to publish notices in the Federal Register of all permit applications and make available to the public information received as part of any such applications. *Id.* § 1539(c).

In 2005, the Fish and Wildlife Service listed three antelope species – the scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) – as endangered. *See* Final Rule to List the Scimitar-Horned Oryx, Addax, and Dama Gazelle as Endangered

("Listing Rule"), 70 Fed. Reg. 52,319, 52,319 (Sept. 2, 2005). On the same day that the Service designated the antelope species as endangered, it issued a blanket exemption for qualifying domestic entities and individuals – including some sport hunting programs – that breed the antelope species in captivity. *See* Exclusion of U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle from Certain Prohibitions ("Captive-Bred Exemption"), 70 Fed. Reg. 52,310, 52,311, 52,317 (Sept. 2, 2005). Under the Captive-Bred Exemption, the FWS allowed qualified owners of domestic, captive-bred antelope to engage in activities otherwise prohibited by Section 9 of the ESA without applying for individual permits on a case-by-case basis. *Id.* at 52,317.

In 2009, the District Court, in an action preceding this case, determined that the Captive-Bred Exemption violated Section 10(c) of the Act. *Friends of Animals v. Salazar* (*Antelope I*), 626 F. Supp. 2d 102, 115 (D.D.C. 2009). The court found "that the text, context, purpose and legislative history of the statute make clear that Congress intended permits for the enhancement of propagation or survival of an endangered species to be issued on a case-by-case basis following an application and public consideration of that application," not pursuant to blanket exemptions. *Id.* Following this decision, FWS revoked the Captive-Bred Exemption. *See* Removal of the Regulation That Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle from Certain Prohibitions ("Removal Rule"), 77 Fed. Reg. 431, 431 (Jan. 5, 2012).

On January 17, 2014, President Obama signed into law the Consolidated Appropriations Act, 2014 ("Appropriations Act"). Division G, Title I, Section 127 of the Appropriations Act ("Section 127") provides:

Before the end of the 60-day period beginning on the date of enactment of this Act, the Secretary of the Interior shall reissue the final rule published on September 2, 2005 (70 Fed. Reg. 52310 et seq.) without regard to any other provision of statute or regulation that applies to issuance of such rule.

Pub. L. No. 113-76, div. G, tit. I, § 127, 128 Stat. 5, 315-16 (2014). On March 19, 2014, the Service complied with Section 127 and reinstated the Captive-Bred Exemption. *See* Reinstatement of the Regulation That Excludes U.S. Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle from Certain Prohibitions ("Reinstatement Rule"), 79 Fed. Reg. 15,250, 15,250 (Mar. 19, 2014) (codified at 50 C.F.R. § 17.21(h)).

On March 5, 2014, Friends of Animals, an animal advocacy organization, brought suit against FWS and the Department of the Interior ("Federal Appellees"), alleging that the Reinstatement Rule violates the Act and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and that Section 127 violates the United States Constitution. *See Friends of Animals v. Jewell*, 82 F. Supp. 3d 265, 267 (D.D.C. 2015). Safari Club International intervened as a defendant in the suit (together with the Federal Appellees, "Appellees"). *See id.* at 270.

On cross-motions for summary judgment, the District Court granted Appellees' motions for summary judgment and denied Friends of Animals' motion for summary judgment. *Id.* at 279. The District Court found that the Reinstatement Rule was not arbitrary or capricious under the APA, *id.* at 278-79; that Friends of Animals did not have Article III standing to challenge the constitutionality of Section 127, *id.*

at 278; and that even if Friends of Animals had standing, Section 127 is not unconstitutional, *id.* at 278 n.9. Friends of Animals now appeals.

Under *FEC v. Akins*, 524 U.S. 11 (1998), Friends of Animals has informational standing to pursue its claims, so there is no jurisdictional impediment to this lawsuit. We reject Friends of Animals' claims on the merits, however. Congress acted within constitutional bounds when it passed Section 127. Therefore, there can be no doubt that the Service was fully authorized to reinstate the Captive-Bred Exemption.

## I.  BACKGROUND

### A.  Statutory Background

The stated purpose of the Endangered Species Act is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section." 16 U.S.C. § 1531(b). Section 4 of the Act directs the Secretary of the Interior, who has delegated his authority to FWS, to list species that he determines are "threatened" or "endangered" under specified criteria. *Id.* § 1533. "When a species . . . is listed as either 'threatened' or 'endangered' under the Act, it is then subject to a host of protective measures designed to conserve the species." *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.— MDL No. 1993*, 709 F.3d 1, 2 (D.C. Cir. 2013).

As noted above, Section 9 of the Act makes it unlawful "for any person subject to the jurisdiction of the United States

to," *inter alia*, "take" any endangered species within the United States or "possess, sell, deliver, carry, transport, or ship, by any means whatsoever" any endangered species "taken" in violation of the Act. 16 U.S.C. § 1538(a)(1)(B), (D). The Act defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). While the Act contains specific guidelines when it comes to determining whether a species should be listed as endangered, FWS has flexibility under the Act in assessing how to conserve a species after it has been listed as endangered. Most relevant to this case, Section 10 of the Act authorizes the Service to, *inter alia*, "permit . . . any act otherwise prohibited by [Section 9] for scientific purposes or to enhance the propagation or survival of the affected species." *Id.* § 1539(a)(1)(A).

Section 10(c) of the Act specifies that

> [t]he Secretary shall publish notice in the Federal Register of each application for an exemption or permit which is made under this section. Each notice shall invite the submission from interested parties, within thirty days after the date of the notice, of written data, views, or arguments with respect to the application; except that such thirty-day period may be waived by the Secretary in an emergency situation where the health or life of an endangered animal is threatened and no reasonable alternative is available to the applicant, but notice of any such waiver shall be published by the Secretary in the Federal Register within ten days following the issuance of the exemption or permit. Information received by the Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding.

*Id.* § 1539(c). Section 10(d) further provides that the Secretary may only grant a Section 10 permit if he finds and publishes in the Federal Register that the permit was applied for in good faith, will not operate to the disadvantage of the endangered species, and will be consistent with the purposes and policy of the Act. *Id.* § 1539(d).

## B.  Factual and Procedural Background

This case concerns three antelope species – the scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) – whose herds have dwindled, if not disappeared, from their native environments in northern Africa. As of June 2013, "[t]he oryx is believed to be extirpated in the wild, the addax numbers fewer than 300, and the dama gazelle numbers fewer than 500." 12-Month Findings on Petitions to Delist U.S. Captive Populations of the Scimitar-horned Oryx, Dama Gazelle, and Addax, 78 Fed. Reg. 33,790, 33,791 (June 5, 2013). Despite dwindling wild populations, captive populations of the three antelope species exist in the United States and other parts of the world. As of 2013, the Fish and Wildlife Service estimated that there were "approximately 4,000 to 5,000 scimitar-horned oryx, 1,500 addax, and 750 dama gazelle in captivity worldwide." *Id.*

FWS has spent more than two decades considering the antelope species with input from both commercial and non-profit groups interested in conserving the species for different ends. A detailed account of this regulatory history is set forth in *Safari Club International v. Jewell*, 960 F. Supp. 2d 17, 33-41 (D.D.C. 2013). Here we provide only a summary of the agency's regulatory efforts that are relevant to the present dispute.

In 2005, the Service listed the scimitar-horned oryx, addax, and dama gazelle as endangered throughout the world. *See* Listing Rule, 70 Fed. Reg. at 52,319. At the same time, the Service issued the Captive-Bred Exemption, which authorized activities with respect to these species that were otherwise prohibited under Section 9 without individual permits. 70 Fed. Reg. at 52,310, 52,317. In other words, with respect to U.S. captive-bred herds of the three antelope species, the Captive-Bred Exemption provided a blanket exemption from these proscriptions of Section 9. The rule required persons claiming the benefit of the exemption to maintain accurate written records of activities, including births, deaths, and transfer of specimens, and to make those records accessible to the Fish and Wildlife Service for inspection. Captive-Bred Exemption, 70 Fed. Reg. at 52,317.

In 2009, shortly after the Captive-Bred Exemption was promulgated, two sets of plaintiffs, including Friends of Animals, filed lawsuits against FWS challenging the rule in the United States District Court for the Northern District of California and in the United States District Court for the District of Columbia. The lawsuits were then consolidated to be heard in United States District Court for the District of Columbia. *See Antelope I*, 626 F. Supp. 2d 102. After reviewing the parties' competing motions for summary judgment, the District Court granted partial summary judgment in favor of the plaintiffs. *Id.* at 120. In finding that the Captive-Bred Exemption violated Section 10(c) of the Act, the court pointed to the words of the statute that say that "[t]he Secretary shall publish notice in the Federal Register of *each* application for an exemption or permit which is made under this section." *Id.* at 115 (alteration in original) (quoting 16 U.S.C. § 1539(c)). The court then concluded that, "[a]fter examining the text, context, purpose and legislative history of section 10," it was clear that "subsection 10(c) requires case-

by-case consideration before the FWS may permit otherwise prohibited acts to enhance the propagation or survival of endangered species." *Id.* at 116.

On July 7, 2011, following the court's decision in *Antelope I*, the Service published a proposed rule to withdraw in full the Captive-Bred Exemption. On January 5, 2012, FWS issued a final rule removing the Captive-Bred Exemption. The rule explained:

> This change to the regulations is in response to a court order that found that the rule for these three species violated section 10(c) of the Act. These three antelope species remain listed as endangered under the Act, and a person will need to qualify for an exemption or obtain an authorization under the current statutory and regulatory requirements to conduct any prohibited activities.

Removal Rule, 77 Fed. Reg. at 431.

After FWS issued the proposed rule, but before issuance of the final Removal Rule, Safari Club International filed a suit in District Court alleging that the Service had violated the Act and the APA by including U.S. captive-bred herds of the three antelope species in its 2005 Listing Rule. *See Safari Club Int'l v. Jewell* (*Antelope II*), 960 F. Supp. 2d 17, 23 (D.D.C. 2013). Thereafter, the Exotic Wildlife Association filed suit to invalidate and set aside the Removal Rule. *See id.* at 23-24. Following consolidation of these actions, the District Court upheld the Listing Rule and upheld the Removal Rule as a "rational response" to the court's 2009 decision in *Antelope I*. *Id.* at 61, 84. The plaintiffs' appeal to this court in *Antelope II* is being held in abeyance pending resolution of the present dispute.

On October 16, 2013, Friends of Animals filed an action in the District Court challenging the Service's administration of Section 10(a)(1)(A) permitting for the antelope species, and also seeking to invalidate four Section 10 permits allowing takes of those species. *See* Complaint at 30-31, *Friends of Animals v. Ashe* (*Antelope III*), No. 13-CV-01580 (D.D.C. Oct. 16, 2013). This case has also been held in abeyance pending resolution of the present dispute.

On January 16, 2014, Congress passed – and on January 17, 2014, President Obama signed into law – Section 127, which provides:

> Before the end of the 60-day period beginning on the date of enactment of this Act, the Secretary of the Interior shall reissue the final rule published on September 2, 2005 (70 Fed. Reg. 52310 et seq.) without regard to any other provision of statute or regulation that applies to issuance of such rule.

Pub. L. No. 113-76, div. G, tit. I, § 127, 128 Stat. 5, 315-16 (2014). On March 19, 2014, the Service complied with Section 127 and reinstated the Captive-Bred Exemption. *See* Reinstatement Rule, 50 C.F.R. § 17.21(h). Friends of Animals filed this action on March 5, 2014, alleging that Section 127 was an unconstitutional violation of the separation of powers between the legislative and judicial branches. *See Friends of Animals v. Jewell*, 82 F. Supp. 3d 265, 273 (D.D.C. 2015). After the Service issued the Reinstatement Rule, Friends of Animals amended its complaint to add a claim that the Reinstatement Rule was invalid under the APA because it violated Section 10(c) of the Act. *See id.* at 267 & n.1.

The District Court resolved the case on cross-motions for summary judgment, denying Friends of Animals' motion and

granting judgment for Appellees. *Id.* at 279. The court followed the holding of *Antelope I* that Section 10(c) of the Act grants Friends of Animals a right to information the deprivation of which confers Article III standing for its APA claim. *Id.* at 271-73. However, the court ruled that Friends of Animals lacked standing to challenge the constitutionality of Section 127 because its "informational rights are not implicated by its constitutional challenge." *Id.* at 273.

On the merits, the District Court found no merit in Friends of Animals' APA claim that the Service's Reinstatement Rule violated Section 10(c) of the Act. *Id.* at 278-79. The court held that, as a consequence of Section 127, "Section 10(c) does not apply to the Reinstatement Rule and the FWS's actions in promulgating the rule were compelled by the statute [and] consistent with congressional intent." *Id.* at 279. The District Court further noted that, even if Friends of Animals had standing to challenge the constitutionality of Section 127, that claim would fail because Section 127 had amended existing law prospectively and had not retroactively changed the result in any particular case. *Id.* at 278 n.9 ("Section 127 does not establish what the law was at a prior time or require its application to a case already adjudicated. Rather, Section 127 directs the FWS to issue the Reinstatement Rule, thus establishing what the law will be prospectively."). This appeal followed.

## II. ANALYSIS

We review the District Court's decision on standing *de novo*. *In re Endangered Species Act Section 4 Deadline Litig.—MDL No. 2165*, 704 F.3d 972, 976 (D.C. Cir. 2013). Likewise, we review the District Court's grant of Appellees' motions for summary judgment and denial of Friends of

Animals' motion for summary judgment *de novo*. *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008).

### A.  Standing

Friends of Animals is "a membership organization that seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free living and domestic animals." Appellant's Br. at 1. Friends of Animals "engages in a variety of advocacy programs in support of these goals," and informs its members of its advocacy work through its magazine, website, and other published reports. *Id.* In addition, Friends of Animals regularly participates in the Act's Section 10 permitting process in order to protect threatened and endangered species under the Act, including the three antelope species. *Id.* On the record before us, and under controlling precedent, it is clear that Friends of Animals has standing to pursue both its statutory and constitutional claims.

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. FEC*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. First, the claimant must have suffered an "injury in fact" – that is, an invasion of a legally protected interest which is "concrete and particularized" and "actual or imminent." *Id.* (citations omitted). Second, there must be a causal connection between the claimant's injury and the subject of his complaint such that the injury is "fairly traceable to the challenged action of the defendant." *Id.* (alterations and citation omitted). Third, it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 561 (citation omitted). "The party

invoking federal jurisdiction bears the burden of establishing these elements." *Id.*

The Supreme Court explained in *FEC v. Akins* that a plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *see also Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (holding that failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"). Following *Akins*, this circuit has recognized that "a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quoting *Akins*, 524 U.S. at 21); *see also Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011) (explaining that "a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain").

Friends of Animals contends that Section 10(c) of the Act requires the Secretary of the Interior to disclose information about permitted takes of captive members of the three antelope species. According to Friends of Animals, Section 127 and the Reinstatement Rule deny Friends of Animals this information, which Friends of Animals otherwise has a statutory right to obtain. Friends of Animals thus maintains that it has informational standing to pursue both its constitutional and statutory claims. We agree.

In pertinent part, Section 10(c) of the Act provides:

> The Secretary *shall* publish notice in the Federal Register of *each application for an exemption or permit* which is made under this section. Each notice shall invite the submission from interested parties, within thirty days after the date of the notice, of written data, views, or arguments with respect to the application . . . . *Information received by the Secretary as a part of any application shall be available to the public* as a matter of public record at every stage of the proceeding.

16 U.S.C. § 1539(c) (emphases added). Under the language of Section 10(c), the Secretary of the Interior must disclose information it receives in connection with any Section 10 permit. *See id.*; *see also Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002) (finding that the Fish and Wildlife Service violated Section 10(c) of the Act by failing to make public information it had received as part of a permit application). Thus, Section 10(c) clearly creates a right to information upon which a claim of informational standing may be predicated.

In enacting Section 127, Congress compelled FWS to issue the Reinstatement Rule, which eliminates the applicability of individual Section 10 permitting requirements that would otherwise have been necessary to engage in prohibited activities that enhance the propagation or survival of the three antelope species. As a result, Friends of Animals is denied information relating to permitted takes of U.S. captive-bred herds of the three antelope species. Friends of Animals regularly participates in and requests such information as part of the Section 10 permitting process, and was in the process of doing so when Section 127 was enacted. Friends of Animals claims that the information provided by Section 10(c) helps it meaningfully participate in the Act's

permitting process, as well as engage in related advocacy efforts to protect the three antelope species. Given Friends of Animals' goals and organizational activities, there is no reason to doubt Friends of Animals' standing here.

Citing this court's decision in *Feld Entertainment*, Appellees argue that Section 10(c) cannot provide Friends of Animals with a basis for informational standing. In *Feld Entertainment*, we rejected the plaintiff's attempt to claim informational standing to bring suit under the Act's citizen suit provision against Feld Entertainment, Inc., which operates the Ringling Brothers and Barnum & Bailey Circus, for allegedly "taking" circus elephants in violation of Section 9 of the Act. 659 F.3d at 17, 22-24. Importantly, we noted that even if the plaintiff's underlying claim was correct – *i.e.*, that the defendant's conduct constituted a prohibited "taking" under Section 9 of the Act – "nothing in section 9, even under [the plaintiff's] view, would entitle plaintiffs to any information." *Id.* at 23. We acknowledged that if the defendant sought to pursue the disputed conduct, "it would have to seek a section 10 permit from the Fish and Wildlife Service, and section 10(c) would then entitle [the plaintiffs] to obtain the information received by the Service as part of [the defendant's] permit application." *Id.* But because Section 9, the statutory basis for the plaintiff's suit, provided the plaintiff with no right to information, we found informational standing lacking. *Id.* at 22-24.

The present case is clearly distinguishable from *Feld Entertainment*. Friends of Animals' statutory and constitutional claims directly implicate Section 10's disclosure requirement, which as explained, provides Friends of Animals with a right to information. Having been denied such information, Friends of Animals has suffered a concrete and particularized "injury in fact" under *Akins*. Because

Friends of Animals' injury is "fairly traceable to the challenged action" of the Federal Appellees, and the alleged injury will be "redressed by a favorable decision" by this court, *Lujan*, 504 U.S. at 560-61 (alterations and citations omitted), Friends of Animals has standing to pursue its claims.

**B.   Friends of Animals' Constitutional Claim**

The United States Constitution "enumerates and separates the powers of the three branches of Government in Articles I, II, and III, and it is this 'very structure' of the Constitution that exemplifies the concept of separation of powers." *Miller v. French*, 530 U.S. 327, 341 (2000) (quoting *INS v. Chadha*, 462 U.S. 919, 946 (1983)). "Article III of the Constitution establishes an independent Judiciary, a Third Branch of Government with the 'province and duty . . . to say what the law is' in particular cases and controversies." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1322 (2016) (ellipsis in original) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). "While the boundaries between the three branches are not '"hermetically" sealed,' the Constitution prohibits one branch from encroaching on the central prerogatives of another." *Miller*, 530 U.S. at 341-42 (citations omitted). Friends of Animals argues that Section 127 is unconstitutional because it infringes upon the judicial power of Article III courts in violation of the separation of powers doctrine. In support of its claim, Friends of Animals relies on two decisions of the Supreme Court: *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), and *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871).

In *Plaut*, several shareholders filed a securities fraud action seeking damages for alleged violations that occurred in 1983 and 1984. *Plaut*, 514 U.S. at 213. While the lawsuit was

pending, however, the Supreme Court held in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), that such action had to be commenced within one year after the discovery of the facts constituting the violation and within three years after the violation. *Lampf*, 501 U.S. at 364. Applying the statute of limitations announced in *Lampf*, the district court in *Plaut* dismissed the shareholders' complaint with prejudice as untimely filed, and the court's judgment became final 30 days later. *Plaut*, 514 U.S. at 214. Responding to *Lampf*, and after the dismissal order in *Plaut* became final, Congress enacted a statute purporting to reinstate lawsuits dismissed under the statute of limitations announced in *Lampf* that would have been timely under the prior limitations period. *See id.* at 214-15.

The Supreme Court in *Plaut* held that Congress' revival of the dismissed actions was an unconstitutional intrusion into matters within the authority of the judicial branch. *Id.* at 225. The Court explained that the legislation at issue was "retroactive legislation, that is, legislation that prescribes what the law *was* at an earlier time, when the act whose effect is controlled by the legislation occurred . . . . When retroactive legislation requires its own application in a case already finally adjudicated, it does no more and no less than 'reverse a determination once made, in a particular case.' Our decisions . . . have uniformly provided fair warning that such an act exceeds the powers of Congress." *Id.* (citations omitted). Because a "judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, . . . Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was." *Id.* at 227.

Friends of Animals contends that Section 127 "simply reverses [the court's] final judgment in *Antelope I* and must

be found unconstitutional" under *Plaut*. Appellant's Br. at 33. We disagree. Section 127 is not retroactive legislation because it does not establish what the law was at an earlier time. Likewise, Section 127 does not apply to a case already decided and does not overturn the court's determination in *Antelope I* – it simply alters the prospective effect of Section 10 of the Act by exempting U.S. captive-bred herds of the three antelope species from the Act's Section 9 prohibitions going forward.

Congress undoubtedly may change the precedential value of a decision by passing prospective legislation, which is what Congress chose to do when it enacted Section 127. *Cf. Bellsouth Corp. v. FCC*, 162 F.3d 678, 692 (D.C. Cir. 1998) (explaining that in *Plaut*, the Supreme Court drew a distinction between "final judgments without prospective effects, which could not be constitutionally revised through legislation, and final judgments with prospective effects, whose *effects* could constitutionally be so revised" (citation omitted)). Indeed, Friends of Animals concedes that, if Congress was "unhappy with the result in *Antelope I*, Congress could . . . cho[o]se to amend Section 10 to allow for the promulgation of a new rule that might allow for a broad take exemption." Appellant's Br. at 35. By directing FWS to reissue the Captive-Bred Exemption "without regard to any other provision of statute or regulation," Appropriations Act, div. G, tit. I, § 127, that is what Congress did here.

In *Klein*, the plaintiff sued the Government for the proceeds of property sold during the Civil War. The suit was filed under a statute granting such a cause of action to noncombatant confederate landowners who could show proof of loyalty to the federal government. 80 U.S. (13 Wall.) at 136, 139. The Supreme Court, in an earlier case, had decided that receipt of a Presidential pardon was sufficient proof of

"loyalty" under this law. *United States v. Padelford*, 76 U.S. (9 Wall.) 531, 543 (1869). The Court of Claims in *Klein* followed that decision and awarded recovery to the plaintiff. *Klein*, 80 U.S. (13 Wall.) at 143. While the Government's appeal was pending, Congress passed a statute providing that no pardon could be admitted as proof of loyalty to the federal government and that acceptance of a pardon, under most circumstances, was conclusive evidence of disloyalty. *Id.* at 142-44. The statute at issue in *Klein* thus directed the Court of Claims and Supreme Court to find that a claimant who had accepted a presidential pardon was in fact disloyal and, therefore, not entitled to land sale proceeds. *Id.* The newly enacted statute further directed that on proof of such a pardon or its acceptance, the Court of Claims and Supreme Court should dismiss the suit for want of jurisdiction. *Id.*

On review, the Supreme Court in *Klein* struck down the statute, explaining that Congress had no authority to "impair[] the effect of a pardon," for the Constitution entrusted the pardon power "[t]o the executive alone." *Id.* at 147. Lacking authority to impair the pardon power of the Executive, Congress could not "direct[] the court to be instrumental to that end." *Id.* at 148. In other words, the statute in *Klein* infringed on the judicial power because it attempted to direct the result without altering the legal standards governing the effect of a pardon – standards Congress was powerless to prescribe. *See id.* at 146-48.

In striking down the statute in *Klein*, the Supreme Court also expressed doubt about Congress' authority to "prescribe rules of decisions to the Judicial Department of the government in cases pending before it." *Id.* at 146. The Court noted:

It is evident . . . that the denial of jurisdiction to this court, as well as to the Court of Claims, is founded solely on the application of a rule of decision, in causes pending, prescribed by Congress. The court has jurisdiction of the cause to a given point; but when it ascertains that a certain state of things exists, its jurisdiction is to cease and it is required to dismiss the cause for want of jurisdiction.

It seems to us that this is not an exercise of the acknowledged power of Congress to make exceptions and prescribe regulations to the appellate power.

*Id.*

Friends of Animals argues that under *Klein*, "Section 127 . . . unconstitutionally interferes in two pending cases before Article III courts, seeking to direct the outcomes in those cases by ensuring that they are deemed moot." Appellant's Br. at 35 (referring to *Antelope II* and *Antelope III*). According to Friends of Animals, *Klein* "stand[s] for the proposition that Congress cannot direct the outcome of a particular pending case by instructing the courts how to interpret and apply the existing law to the specific pending claims." *Id.* at 37.

This court has noted that "*Klein*'s exact meaning is far from clear." *Nat'l Coal. to Save Our Mall v. Norton*, 269 F.3d 1092, 1096 (D.C. Cir. 2001). Similarly, the Supreme Court has observed that "*Klein* has been called 'a deeply puzzling decision.'" *Bank Markazi*, 136 S. Ct. at 1323 (citation omitted). The Supreme Court has explained, however, that "[w]hatever the precise scope of *Klein*, . . . later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.'" *Plaut*, 514 U.S. at 218

(second alteration in original) (quoting *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992)). Friends of Animals acknowledges, as it must, this limitation on the reach of *Klein*. *See* Appellant's Br. at 37. Indeed, in *Bank Markazi v. Peterson*, the Supreme Court, just this term, reaffirmed that *Klein* is so limited. *See Bank Markazi*, 136 S. Ct. at 1323 ("More recent decisions, however, have made it clear that *Klein* does not inhibit Congress from 'amend[ing] applicable law.'" (alteration in original) (quoting *Robertson*, 503 U.S. at 441)).

On the record before us, we have no trouble in concluding that Section 127 amended the applicable law and thus does not run afoul of *Klein*. Section 127 directed the Secretary of the Interior to reissue the Captive-Bred Exemption "without regard to any other provision of statute or regulation that applies to issuance of such rule." Appropriations Act, div. G, tit. I, § 127. By issuing this legislative directive, Congress made it clear that, with respect to U.S. captive-bred herds of the three antelope species, individual permits are *no longer required* to engage in activities otherwise prohibited by Section 9 of the Act. Although the three antelope species remain endangered and subject to certain requirements under the Act, Congress acted within its constitutional authority in amending the scope of Section 10. *See Nat'l Coal. to Save Our Mall*, 269 F.3d at 1094, 1097 (statute at issue, which applied "[n]otwithstanding any other provision of law," did not violate *Klein* because it "amend[ed] the applicable substantive law"); *see also All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012) (dismissing the appellants' challenge under *Klein* where Congress had amended the law by "direct[ing] the agency to issue the rule 'without regard to any other provision of statute or regulation that applies to issuance of such rule'").

Seeking to avoid this conclusion, Friends of Animals argues that "Section 127 makes no change, not even the most minor addition or subtraction, to the ESA or to the legal status of the Three Antelope Species under the ESA." Appellant's Br. at 39. Friends of Animals maintains that "the take prohibitions of Section 9, and the requirements in Section 10 that must be met to obtain a limited exemption from the take prohibition remain exactly as they were before Section 127 was enacted." *Id.* (emphasis omitted). These contentions are meritless, for Section 127 obviously changes the reach of Sections 9 and 10 of the Act. Following the passage of Section 127 and issuance of the Reinstatement Rule, the requirements in Section 10 that otherwise must be met to obtain an exemption from Section 9's take prohibitions *no longer apply* to U.S. Captive-Bred herds of the three antelope species, even though they apply to other endangered species. The Congressional enactment easily passes muster under established law.

## C. Friends of Animals' Statutory Claims

Finally, Friends of Animals contends that the Reinstatement Rule should be set aside under the APA because it violates Section 10(c) of the Act for the reasons articulated by the United States District Court for the District of Columbia in *Antelope I.* Appellant's Br. at 49. This argument is nothing more than a variation on Friends of Animals' claim that Section 127 did not amend the applicable law. As we have already discussed, Section 127 did amend the applicable law by directing the Secretary of the Interior to reissue the Captive-Bred Exemption "without regard to any other provision of statute or regulation that applies to issuance of such rule." Appropriations Act, div. G, tit. I, § 127. The Secretary fulfilled Congress' directive by issuing the

Reinstatement Rule, which is in compliance with the Act and does not violate the APA.

### III. CONCLUSION

For the foregoing reasons, the judgment of the District Court is affirmed.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, concurring: I write separately not because I have any deep disagreement with the majority—indeed, I wholly embrace the majority's conclusion and nearly all of its language—but only to express a single misgiving. As the majority makes plain, "the requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" Maj. Op. at 12 (quoting *Davis v. FEC*, 554 U.S. 724, 733 (2008) (other citations and internal quotation marks omitted). I am not convinced that appellant has carried that burden with respect to its constitutional, separation-of-powers claim. Rather, as the district court reasoned, the breach of right for which the Friends of Animals seek redress is informational. *See Friends of Animals v. Jewell*, 82 F. Supp. 3d 265, 273 (D.D.C. 2015). The alleged constitutional violation does not cause that breach. I therefore would prefer that we affirmed the district court as to the constitutional claim on the basis relied upon by that court. That is, that plaintiffs have not established standing. Plaintiffs have not alleged that the unconstitutional act caused them harm or that its redress can be had in this lawsuit.

That said, nonetheless I join entirely the disposition of the majority. I agree that the majority's analysis of the constitutional claim is legally correct. I concur entirely with everything else in the majority's opinion.