# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued October 13, 2016   Decided December 16, 2016

No. 16-5018

SILVER STATE LAND, LLC,
APPELLANT

v.

JANICE M. SCHNEIDER, IN HER OFFICIAL CAPACITY AS
ASSISTANT SECRETARY, LAND AND MINERALS MANAGEMENT,
AND NEIL KORNZE, IN HIS OFFICIAL CAPACITY AS PRINCIPAL
DEPUTY DIRECTOR,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00717)

————

*Paul B. Smyth* argued the cause and filed the briefs for appellant. *John F. Henault, Jr.* entered an appearance.

*Jeffrey S. Beelaert*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *John C. Cruden*, Assistant Attorney General, and *William B. Lazarus* and *David C. Shilton*, Attorneys.

Before: HENDERSON and ROGERS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In September 2011, the City of Henderson, Nevada (the "City" or "Henderson") executed an agreement with the Las Vegas National Sports Center ("Sports Center") to construct sports venues on a 480-acre parcel of federally-owned public land. Under the agreement, Sports Center was to serve as the developer and work with the City in designing the project. In exchange, the City agreed to request the Bureau of Land Management ("Bureau") in the Department of Interior ("Department") to convey the public land to the developer. After completion of the project, the developer was to transfer ownership of the land and the sports complex to the City, and the City would lease back the venues to the developer.

After reviewing the City's request, the Bureau agreed to conduct a modified competitive auction of the land. The City accepted the Bureau's terms and then substituted Appellant Silver State Land, LLC ("Silver State"), a controlled affiliate of Sports Center, as the designated bidder. In April 2012, the Bureau announced that Silver State would be the designated bidder in a sealed-bid sale because it had agreed "to develop the property for public recreation and commercial uses approved by the City." Joint Appendix ("JA") 371. Under the modified bidding process, Silver State had the right to match the highest bid.

On June 4, 2012, Silver State submitted the only bid, which was accepted by the Bureau. On November 28, 2012, Silver State paid the balance of money due in connection with the sale and asked the Bureau to issue the patent for the land so that Silver State could record it. Within hours after Silver State transferred the funds to the Bureau, Sports Center

terminated its agreement with Henderson. On November 29, 2012, Henderson requested the Bureau to cancel the public land sale because the developer had backed out of its agreement to build the sports complex. In January 2013, the City filed an action in Nevada state court against the developer. However, the parties settled the state court litigation in March 2013. Silver State agreed to give the City $4.25 million after it received and recorded the patent, and the City agreed to withdraw its objection to the land sale. Silver State also agreed not to pursue the sports complex project, or any other development, in Henderson.

After reviewing the matter, the Department determined that the Bureau should not give Appellant a patent for the land. Silver State filed suit in District Court to challenge the Department's action. Appellant contended that the Department — through the Appellee, the Assistant Secretary for Land and Minerals Management ("the Secretary") — violated the Federal Land Policy and Management Act of 1976 ("the Act") by canceling the land sale more than thirty days after Appellant paid for the land.

The District Court held that the Secretary had plenary power to terminate the land sale because consummation of the sale would have been contrary to law. *See Silver State Land, LLC v. Schneider*, 145 F. Supp. 3d 113 (D.D.C. 2015). The District Court agreed with the Secretary that the Bureau had authorized a modified competitive land auction, giving special preference to Appellant, only because of the public benefits that the sale was to produce. Those public benefits were to come from the agreement that Appellant had signed with Henderson to build a sports complex, which was supposed to attract jobs and tourism to the region. However, after Appellant obtained the benefit of the modified competitive auction, it broke off the agreement with Henderson. The

District Court therefore accepted the Secretary's position that issuing the patent to Appellant would be contrary to the public benefits requirement needed to authorize a modified competitive auction. The court granted summary judgment to the Secretary and Silver State now appeals.

We affirm the judgment of the District Court. We hold that the Secretary had plenary power to terminate the land sale, and that the Act did not constrain the Secretary's power. We reject Appellant's claim that the Secretary's action was arbitrary and capricious. Appellant's Agreement with the City was the sole justification for the special auction. However, the auction sale was rendered unlawful when Sports Center terminated the agreement. Finally, we hold that Appellant did not suffer a Due Process Clause violation because it never acquired a property interest in the land.

## I.  BACKGROUND

### A.  *Statutory and Regulatory Background*

Appellee, the Assistant Secretary for Land and Minerals Management of the Department of the Interior, oversees the Bureau of Land Management. The scope of the Bureau's authority over federal public lands is defined by a patchwork of statutes. An 1812 statute established the General Land-Office, located in the Department of the Treasury, with the power "to superintend, execute and perform, all such acts and things, touching or respecting the public lands of the United States." Act of Apr. 25, 1812, ch. 68, § 1, 2 Stat. 716, 716. When Congress created the Department of the Interior in 1849, it directed "the Secretary of the Interior [to] perform all the duties in relation to the General Land Office . . . now discharged by the Secretary of the Treasury." Act of Mar. 3, 1849, ch. 108, § 3, 9 Stat. 395, 395. In 1946, Congress

established the Bureau of Land Management and charged it with performing "[t]he functions of the General Land Office." 1946 Reorganization Plan No. 3, § 403(a), 60 Stat. 1100. The result of this reorganization is the current statutory authorization for the Bureau:

> The Secretary of the Interior or such officer as he may designate shall perform all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and, also, such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government.

43 U.S.C. § 2. The Supreme Court, interpreting the Department and the General Land Office's statutory authorizations, has held that "the Department has been granted plenary authority over the administration of public lands." *Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 336 (1963).

Although the Department enjoys plenary authority "as a general rule," this authority may be constrained if there is "some specific provision to the contrary in respect to any particular grant of public land." *Corp. of the Catholic Bishop of Nesqually v. Gibbon*, 158 U.S. 155, 167 (1895). One such provision is at issue in this case: the Federal Land Policy and Management Act of 1976. The Act declares that its provisions shall "be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law." 43 U.S.C. § 1701(b). The Act outlines certain procedures that govern the sale of public land. It requires, *inter alia*, sales of public land to "be conducted

under competitive bidding procedures to be established by the Secretary." 43 U.S.C. § 1713(f).

Pursuant to § 1713(f), the Department has promulgated regulations governing competitive bidding. In accordance with the statute's default rule that public land sales "shall be conducted under competitive bidding procedures," *id.*, the Department's regulations require that the "general procedure for sales of public lands" is a competitive public auction. 43 C.F.R. § 2710.0-6(c)(3)(i). However, if certain conditions are met, the Department may deviate from the general procedure and use either a direct sale or a modified competitive sale. 43 C.F.R. § 2710.0-6(c)(3)(ii), (iii). To use a modified competitive sale, the Department must determine that "it is necessary in order to assure equitable distribution of land among purchasers or to recognize equitable considerations or public policies." 43 C.F.R. § 2711.3-2(a).

The Act prescribes a timeline for the Secretary to follow when issuing a patent to the winning bidder in either a competitive or modified competitive bidding process:

> The Secretary shall accept or reject, in writing, any offer to purchase made through competitive bidding at his invitation no later than thirty days after the receipt of such offer . . . . Prior to the expiration of such periods the Secretary may refuse to accept any offer or may withdraw any land or interest in land from sale under this section when he determines that consummation of the sale would not be consistent with this Act or other applicable law.

43 U.S.C. § 1713(g).

**B.** *Factual and Procedural Background*

Las Vegas has never been home to a major league sports franchise. Texas real estate developer Chris Milam sought to capitalize on this opportunity. In 2011, Milam's Las Vegas National Sports Center signed a Master Project Agreement ("the Agreement") with the City of Henderson, Nevada. The Agreement specified that Henderson would nominate a 480-acre tract of federal public land in the city for sale to Sports Center pursuant to the Southern Nevada Public Land Management Act. Under the Agreement, Sports Center promised to "plan, design, develop, construct, complete and operate" a major sports complex for professional teams in a number of sports, including basketball, soccer, football, and baseball. JA 122. The Agreement also provided that if either Henderson or Sports Center "determines that the Project is not viable . . . the City or [Sports Center] shall have the right to terminate this Agreement" prior to the date that the United States issues the land patent conveying the federal land to Sports Center. JA 129; *see also* JA 120, 122.

In accordance with the Agreement, Henderson nominated the tract of land "for sale under the Bureau of Land Management (BLM) Direct Sale Process as set forth in 43 CFR 2711.3-3." JA 109. Citing the "formal Project Agreement" with Sports Center, Henderson's nomination letter to the Bureau estimated that constructing the four facilities would create "approximately 10,000 immediate construction jobs" and "provide employment for an estimated 4,000 employees." *Id*. According to Henderson, an open-bid auction would "unduly jeopardize" the project by inviting speculative bidding and delaying the process. JA 110. Henderson therefore requested that the Bureau "immediately offer[] the subject parcels for direct sale" to Sports Center. JA 111.

Because the Bureau found that Henderson's nomination did "not rise to the level of a 'public project' as contemplated by [43 C.F.R. § 2711.3-3]," the Bureau concluded that a direct sale to Sports Center would be inappropriate. JA 113. However, the Bureau committed to "pursue a modified competitive sale" in accordance with 43 C.F.R. § 2711.3-2(a). JA 114.

Henderson requested that the Bureau name Appellant, Silver State, as the designated bidder with the right to meet the highest bid. JA 358. Accordingly, on April 4, 2012, the Bureau published a Notice of Realty Action in the Federal Register announcing the modified competitive auction and naming Appellant as the designated bidder. JA 370–71. In the Notice, the Bureau justified the modified competitive auction because "Silver State Land LLC and the City of Henderson have developed an agreement that provides for long-term public benefits to the City and local residents." JA 371. The Bureau also explained that "[w]ithin 30 days of the sale, the [Bureau] will, in writing, either accept or reject all bids received." JA 371. The Notice also advised that the Bureau could "withdraw any parcel of land or interest therein from sale" if the Bureau determined that "the sale would be inconsistent with any law." JA 373.

On June 4, 2012, the Bureau held the modified competitive auction. Appellant was the sole bidder at $10,560,000 — the appraised value of the land. JA 381; *see also* JA 156 (appraising the "total property value" at $10,560,000). In accordance with the requirements detailed in the Notice of Realty Action, Appellant also included a certified check for twenty percent of its bid, roughly $2,000,000. JA 381. Eight days later, on June 12, 2012, the Bureau accepted Appellant's bid, and directed Appellant to

pay the remaining eighty percent of the purchase price by December 3, 2012. JA 390. Appellant complied and transmitted the balance to the Bureau on November 28, 2012. JA 404.

Hours after completing the purchase, Appellant delivered a letter to the City of Henderson terminating the Agreement with Henderson because, in Appellant's view, "the overall project is not viable." JA 409; *see also* JA 451. Early the following morning, the City Attorney for Henderson emailed the Bureau, requesting that the Bureau "immediately withdraw the roughly 480 acres the City nominated for Silver State Land LLC pursuant to 43 CFR 2711.3-1." JA 411. The e-mail also alleged that "the City believes that Silver State Land LLC fraudulently induced the City and the federal government to sell it land." JA 411. In a follow-up letter that same day, the City Attorney further explained that Henderson had requested the modified competitive sale "based upon the Agreement and the repeated representations and assurances" of the developer, Sports Center, and Appellant. JA 413. Henderson requested that the Bureau refrain from issuing the land patent to Appellant. JA 414. Subsequently, the Bureau and Appellant agreed to several extensions of the date on which the Bureau was to issue the patent. JA 428, 656.

On January 28, 2013, Henderson filed suit in Nevada state court against Appellant, JA 431, alleging that Appellant "made numerous false and misleading representations to the City" in order to induce the land sale, JA 456. The state court dismissed without prejudice Henderson's fraud claim, but denied Appellant's motion to dismiss other contract claims. *City of Henderson v. Milam*, No. A-13-675741-B (Nev. Dist. Ct., Clark Cty., Feb. 28, 2013). On March 13, 2013, Appellant and Henderson agreed to a settlement, under which Henderson would be paid $250,000 immediately, and

$4,250,000 after Appellant received and recorded the patent to the land. JA 674. Henderson agreed to withdraw its objection to the sale, and to "[t]ake no further action to impair" the sale. JA 676. The developer agreed that neither he nor any entity he was affiliated with — including Appellant — would ever "seek to or engage in any business activities or development activities within Henderson." *Id*. Henderson informed the Bureau of the resolution of the civil suit, and sent a copy of the settlement agreement to the Bureau. JA 670.

On May 10, 2013, the Bureau issued a Recommendation Memorandum to Appellee, the Assistant Secretary for Lands and Minerals Management. JA 667. The Bureau recommended that the Secretary "assert jurisdiction over this matter pursuant to 43 C.F.R. § 4.5(a) and direct the [Bureau] to: (i) not issue the patent to Silver State, or its successors or assigns, (ii) terminate the sale, and (iii) refund any monies still held by the Department in connection with this sale." *Id*. The Bureau cited "[t]he Secretary's and [Appellee's] (as designated by the Secretary) broad authority over the disposition of the public lands up to the point of patent issuance" to justify the termination of the sale. JA 671. The Bureau described the "public benefits [Henderson] wished to promote through the [Bureau's] use of a modified competitive sale process [that] no longer exists as evidenced by the Settlement Agreement." *Id.* Because the basis for the modified competitive sale — the Agreement between Henderson and Appellant — had dissolved, and the civil settlement precluded its resurrection, the Bureau recognized that it "would not have agreed to utilize a modified competitive process" under such circumstances. *Id.* In a Decision Memorandum, the Secretary adopted and approved the Bureau's Recommendation Memorandum, rendering "the final decision by the U.S. Department of Interior." JA 664.

Appellant subsequently filed suit in the District Court seeking declaratory and injunctive relief. Appellant claimed that (1) the Secretary lacked authority to terminate the sale under 43 U.S.C. § 1713, the Federal Land Policy and Management Act of 1976; (2) the Secretary's decision was arbitrary and capricious; and (3) the Secretary was legally obligated to issue the land patent. JA 13–16. Appellant filed a motion for summary judgment in which it also asserted that the Secretary terminated the land sale without affording it due process. Motion for Summary Judgment, *Silver State Land, LLC v. Beaudreau*, No. 1:13-cv-00717 (D.D.C. Sept. 2, 2014). The Secretary filed a cross motion for summary judgment. The District Court granted the Secretary's cross motion and denied Appellant's motion. The court held that the Secretary "has authority to terminate the sale of public land, even after acceptance of a purchase offer, where consummation of the sale would be contrary to law." *Silver State Land, LLC*, 145 F. Supp. 3d at 126. The court rejected Appellant's argument that the Federal Land Policy and Management Act contravened the Secretary's plenary authority. *Id.* at 128–33. The court also rejected Silver State's argument that the termination was arbitrary and capricious as well as its Due Process Clause argument. *Id.* at 133–41. Appellant then filed this appeal.

## II.  ANALYSIS

### A.  *Standard of Review*

We review the District Court's denial of Appellant's motion for summary judgment *de novo*. *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016). "In reviewing *de novo* the district court's grant of summary judgment on [the Department's] administrative decisions, we directly

review those decisions." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 753 (D.C. Cir. 2007) (citing *Castlewood Prods., LLC v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004)). An agency's action withstands review under the Administrative Procedure Act unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**B.** *The Secretary's Authority*

The Secretary properly exercised her plenary authority when she terminated the land sale to Appellant. The Department of the Interior's authorizing legislation delegates "all executive duties appertaining to the surveying and sale of the public lands" to the Secretary or his designee. 43 U.S.C. § 2. That delegation includes the authority to terminate a land sale using a modified competitive auction where the basis for the modified auction dissipates. This proposition is confirmed by a consistent line of Supreme Court precedent interpreting the Department's enabling legislation. *See Hoefler v. Babbitt*, 139 F.3d 726, 728 (9th Cir. 1998) (referring to the "wall of authority" confirming the Department's "plenary authority over the administration of public lands").

In *Cameron v. United States*, the Supreme Court explained that the Secretary of the Interior "is charged with seeing that [the] authority [of the Land Department] is rightly exercised to the end that valid claims may be recognized [and] invalid ones eliminated." 252 U.S. 450, 460 (1920). The source of that authority derives from "general statutory provisions," including the Department's enabling legislation. *Id.* at 459; *see also Orchard v. Alexander*, 157 U.S. 372, 382 (1895) ("[T]he rulings of this court since the act of 1836 [are] in favor of the power of the general officers of the land department to review and correct the action of the subordinate

officials in all matters relating to the sale and disposal of public lands.").

The Court laid the precedential foundation for the Secretary's authority to "eliminate[]" invalid claims, *Cameron*, 252 U.S. at 459, in *Knight v. United Land Ass'n*:

> [I]f, when a patent is about to issue, the secretary should discover a fatal defect in the proceedings, or that by reason of some newly-ascertained fact the patent, if issued, would have to be annulled, and that it would be his duty to ask the attorney general to institute proceedings for its annulment, it would hardly be seriously contended that the secretary might not interfere and prevent the execution of the patent. He could not be obliged to sit quietly and allow a proceeding to be consummated which it would be immediately his duty to ask the attorney general to take measures to annul.

142 U.S. 161, 178 (1891) (quoting *Pueblo of San Francisco*, 5 Pub. Lands Dec. 483, 494 (D.O.I. 1887)). Contrary to Appellant's assertion that *Knight* turned on "a land sale statute long since repealed," Br. for Appellant at 37, the cited statute has been incorporated into the Department's current statutory authorization. *Knight*, 142 U.S. at 179 (citing Act of Mar. 3, 1849, ch. 108, 9 Stat. 395, 395); *see also* Part I.A, *supra* (explaining the legislative and organizational history of the Department). *Knight* thus makes it clear that the Secretary may take jurisdiction over a land sale, prior to issuing a land patent, to invalidate a defective transaction.

The Secretary's authority to cancel an invalid land sale extends at least until the issuance of the land patent.

"Generally speaking, while the legal title remains in the United States, the grant is in process of administration, and the land is subject to the jurisdiction of the land department of the government." *Mich. Land & Lumber Co. v. Rust*, 168 U.S. 589, 592 (1897). The Supreme Court, citing *Cameron*, later confirmed the Secretary's authority to cancel a "lease administratively for invalidity at its inception," even after the lease had been issued. *Boesche v. Udall*, 373 U.S. 472, 476 (1963) ("With respect to earlier statutes containing no express administrative cancellation authority, this Court, in *Cameron v. United States* . . . found such authority to exist."). The Secretary's action here, taken before the patent had issued to Appellant, falls comfortably within the period for her to exercise this authority.

In this case, the Secretary terminated an invalid land sale prior to issuing the patent. As discussed in Part I.A, *supra*, "[s]ales of public lands . . . shall be conducted under competitive bidding procedures" unless certain requirements are met. 43 U.S.C. § 1713(f). The Bureau's regulations permit a deviation from a competitive public auction only where "the authorized officer determines it is necessary in order to assure equitable distribution of land among purchasers or to recognize equitable considerations or public policies." 43 C.F.R. § 2711.3-2(a). Here, the Bureau's published Notice of Realty Action made it plain that the Bureau approved a modified competitive sale solely because of the Agreement between Henderson and Appellant. JA 371 ("Silver State Land LLC and the City of Henderson have developed an agreement that provides for long-term public benefits to the City and local residents."). As the Bureau explained in its Recommendation Memorandum, "but for the now-terminated Development Agreement . . ., the [Bureau] would not have agreed to utilize a modified competitive process." JA 671. The Bureau also explained that, given the civil settlement's

prohibition on Appellant "engag[ing] in any business activities or development activities within Henderson," JA 676, the public benefits contemplated by the Agreement would not be realized, JA 671. Having recognized this "fatal defect in the proceedings," *Knight*, 142 U.S. at 178 — the vitiated public benefits required to deviate from a competitive auction — the Secretary was well within her authority to cancel the sale.

### C. *The Federal Land Policy and Management Act of 1976*

Appellant's principal argument is that the procedural requirements for public land sales under the Federal Land Policy and Management Act of 1976 supplant the Secretary's plenary power to terminate an invalid land sale. Br. for Appellant at 14–20, 43–49. Section 203(g) of the Act requires the Secretary to "accept or reject . . . any offer to purchase made through competitive bidding . . . no later than thirty days after the receipt of such offer." 43 U.S.C. § 1713(g). "Prior to the expiration of [those thirty days] the Secretary . . . may *withdraw* any land or interest in land from sale under this section when he determines that consummation of the sale would not be consistent with this Act or other applicable law." *Id.* (emphasis added). The Department's regulations parrot the same statutory language. 43 C.F.R. § 2711.3-1(f) ("Prior to the expiration of [the thirty day period] the authorized officer may . . . *withdraw any tract from sale . . .* .") (emphasis added). Appellant argues that the Secretary acted contrary to the statute and regulation by "withdrawing the land from sale" after thirty days. Br. for Appellant at 14.

Appellant is wrong because the Secretary did not "withdraw" the land from sale. And she was not required to follow the timeline prescribed by 43 U.S.C. § 1713(g) when she terminated the sale. As explained in the Recommendation

Memorandum, the Secretary "terminate[d] the sale process" to Appellant, JA 670; she did not "withdraw any land or interest in land from sale." There is a legally relevant distinction between these two terms.

The Act defines "withdrawal" as "withholding an area of Federal land from . . . sale . . . under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area." 43 U.S.C. § 1702(j). To withdraw, then, means to withhold the parcel of land from sale entirely, not to cancel a specific sale to a specific buyer. The Secretary took the latter action. The Bureau explicitly noted in its Recommendation Memorandum that "the parcel remains designated for disposal" and that the Bureau may "offer[] the parcel after such renomination pursuant to the procedures found at 43 C.F.R. part 2711." JA 672. Because the Secretary did not withdraw the land, she was not bound by the thirty day provision of 43 U.S.C. § 1713(g). Accordingly, Section 1702(j) of the Act does not limit the Secretary's plenary power. *See* 43 U.S.C. § 1701(b) ("The policies of this Act shall become effective only as specific statutory authority for their implementation is enacted . . . and shall then be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law.").

Appellant cites another provision from the Act, as well as a Bureau regulation, to argue that after Appellant "submitted the remaining purchase price, the Secretary incurred a ministerial duty to deliver the patent." Br. for Appellant at 34. Appellant cites 43 U.S.C. § 1718, which requires that "[t]he Secretary shall issue all patents . . . after any disposal authorized by this Act." Br. for Appellant at 17. The problem with this argument is that the land sale here would not have been a "disposal authorized by this Act" because the Act

authorizes a modified competitive sale only when "the Secretary determines it necessary and proper" to fulfill certain public policy goals. 43 U.S.C. § 1713(f). After Appellant dissolved the Agreement, the modified competitive sale was no longer "authorized" by the Act. Because 43 U.S.C. § 1718 only calls on the Secretary to issue patents authorized by the Act, it did not vest Appellant with any right to receive a patent after transmitting final payment.

In further support of its "ministerial duty" argument, Appellant cites a Bureau regulation providing that, "[u]ntil the acceptance of the offer and payment of the purchase price, the bidder has no contractual or other rights against the United States." Br. for Appellant at 34 (quoting 43 C.F.R. § 2711.3-1(g)). However, as the District Court correctly noted: "This regulation merely delineates when an offeror has *no* contractual rights, and not when contractual rights *do* attach. Furthermore, to the extent this regulation may confer any contractual right upon an offeror whose offer has been accepted, the regulation is silent as to what those rights may be." *Silver State Land, LLC*, 145 F. Supp. 3d at 131 n.14. We agree that the Bureau's regulation does not eliminate the authority of the Secretary to cancel an invalid land sale after final payment has been transmitted.

## D. *Appellant's Arbitrary and Capricious Claim*

Appellant argues that the Secretary's termination of the sale was arbitrary and capricious "because [she] failed to consider relevant factors and [acted] contrary to evidence." Br. for Appellant at 20. Appellant advances four arguments in support of this claim: (1) the Secretary's decision turned solely on unproven fraud allegations against Appellant; (2) the Secretary ignored the Nevada state court's dismissal of Henderson's fraud claims; (3) the Secretary failed to cite any

of the three bases for withdrawing a sale listed in 43 C.F.R. § 2711.3-1(f)(1)–(3); and (4) the broken Agreement did not justify the termination of the sale. *Id.* at 21–25. These arguments lack merit.

Appellant's first two arguments fall flat because they rest on an erroneous reading of the Recommendation Memorandum upon which the Secretary relied. It is true that the Memorandum cites "questions [that] have arisen regarding Silver State's intent with respect to [the Agreement] and whether it ever intended to develop the facilities." JA 671. Appellant fails to recognize, however, that the Memorandum offers additional justifications for recommending termination of the sale. Most importantly, the Memorandum cites the fact that "the relationship Henderson had with Silver State . . . no longer exists as evidenced by the Settlement Agreement." *Id.* The Memorandum goes on to explain that "but for the now-terminated Development Agreement . . . the [Bureau] would not have agreed to utilize a modified competitive process." *Id.* In other words, the Secretary's decision did not rise or fall on the existence of Appellant's alleged fraud. Rather, Appellant's abrogation of the Agreement, which was the sole basis of the public benefits needed to justify a modified competitive sale, was more than enough to justify the termination.

Appellant's third argument, that the Secretary failed to comply with 43 C.F.R. § 2711.3-1(f), is incorrect. That regulation only specifies the circumstances under which the Secretary "may *withdraw* any tract from sale." 43 C.F.R. § 2711.3-1(f) (emphasis added). It is irrelevant whether the Secretary "failed to address any of the three limited bases for withdrawing a sale in 43 C.F.R. § 2711.3-(f)(1)-(3)," Br. for Appellant at 25, because that regulation is inapposite here, as

the Secretary did not withdraw the land from sale. *See* Part II.C, *supra* (distinguishing withdrawal from termination).

Appellant's fourth argument — that the dissolved Agreement did not justify the termination of the sale — also misses the mark. Appellant claims that the Agreement "did not guarantee that development of the proposed project would actually occur." Br. for Appellant at 28; *see* JA 129 ("[T]he City or [Sports Center] shall have the right to terminate this Agreement."). This is true, but irrelevant. The Bureau of Land Management approved a modified sale because of Appellant's proposal to build a major sports complex and bring the corresponding public benefits to Henderson. JA 114. Henderson, in accepting the modified competitive sale, told the Bureau that the stadium development would "help support meaningful economic diversification for southern Nevada." JA 115. After Appellant pulled out of the Agreement, the Bureau reasonably concluded that the promised public benefits of the project would not be realized. That the Agreement was terminable by either party has no bearing on the Secretary's decision to cancel the sale to Appellant when the premise for the sale was vitiated.

### E.   *Appellant's Due Process Claim*

Appellant's final claim is that the Secretary violated its rights under the Due Process Clause because the Secretary "never provided Silver State notice and the opportunity to be heard before withdrawing the Land from sale." Br. for Appellant at 34. This claim fails both because the Secretary did not "withdraw" the land from sale and because Appellant never acquired a "protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (quoting U.S. CONST. amend. XIV). Appellant repeats its argument that it had an "administrative right to receive the

patent [that] vested with its payment of the remaining purchase price into escrow." Br. for Appellant at 33. For the reasons discussed *supra* Part II.C, neither the statute (43 U.S.C. § 1718) nor the regulation (43 C.F.R. § 2711.3-1(g)) invoked by Appellant conferred any property rights on Appellant. We cannot find a Due Process Clause violation here because Appellant never acquired a protected interest in property or liberty.

## III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the District Court.