(Slip Opinion)

# Application of the Anti-Nepotism Statute to a Presidential Appointment in the White House Office

Section 105(a) of title 3, U.S. Code, which authorizes the President to appoint employees in the White House Office "without regard to any other provision of law regulating the employment or compensation of persons in the Government service," exempts positions in the White House Office from the prohibition on nepotism in 5 U.S.C. § 3110.

January 20, 2017

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked whether section 3110 of title 5, U.S. Code, which forbids a public official from appointing a relative "to a civilian position in the agency . . . over which [the official] exercises jurisdiction or control," bars the President from appointing his son-in-law to a position in the White House Office, where the President's immediate personal staff of advisors serve. We conclude that section 3110 does not bar this appointment because the President's special hiring authority in 3 U.S.C. § 105(a) exempts positions in the White House Office from section 3110.

A decision of the D.C. Circuit, *Haddon v. Walters*, 43 F.3d 1488 (D.C. Cir. 1995) (per curiam), lays out a different, but overlapping, route to the same result. According to the reasoning of *Haddon*, section 3110 does not reach an appointment in the White House Office because section 3110 covers only appointments in an "agency," which the statute defines to include "Executive agenc[ies]," and the White House Office is not an "Executive agency" within the definition generally applicable to title 5. Although our analysis does not track every element of the D.C. Circuit's reasoning about the meaning of "Executive agency," we believe that *Haddon* arrived at the correct outcome and that our conclusion here—that, because of the President's special hiring authority for the White House Office, section 3110 does not forbid the proposed appointment—squares with both the holding and a central part of the analysis in that case.

## I.

Section 105(a) of title 3 authorizes the President "to appoint and fix the pay of employees in the White House Office without regard to any other provision of law regulating the employment or compensation of persons in the Government service," as long as the employees' pay is within listed

1

salary caps. 3 U.S.C. § 105(a)(1). These employees are to "perform such official duties as the President may prescribe." *Id*. § 105(b)(1). We understand that most White House Office employees are appointed under section 105 or a similar hiring authority, such as 3 U.S.C. § 107 (the authorization for domestic policy staff). *See Authority to Employ White House Office Personnel Exempt from the Annual and Sick Leave Act Under 5 U.S.C. § 6301(2)(x) and (xi) During an Appropriations Lapse*, 36 Op. O.L.C. __, at *5 (Apr. 8, 2011); *Authority to Employ the Services of White House Office Employees During an Appropriations Lapse*, 19 Op. O.L.C. 235, 236 (1995). Such employees are the President's "immediate personal staff" and work in close proximity to him. *Meyer v. Bush*, 981 F.2d 1288, 1293 & n.3 (D.C. Cir. 1993). The appointment at issue here, we understand, would be under 3 U.S.C. § 105(a).

Section 3110 of title 5, also known as the anti-nepotism statute, states that "[a] public official may not appoint, employ, promote, advance, or advocate for appointment, employment, promotion, or advancement, in or to a civilian position in the agency in which he is serving or over which he exercises jurisdiction or control any individual who is a relative of the public official." 5 U.S.C. § 3110(b). The statute expressly identifies the President as one of the "public official[s]" subject to the prohibition, and a son-in-law is a covered "relative." *Id*. § 3110(a)(2), (a)(3). Moreover, under Article II of the Constitution, the President exercises "jurisdiction or control" over the White House Office as well as over the rest of the Executive Branch. *See Myers v. United States*, 272 U.S. 52, 163–64 (1926); *Inspector General Legislation*, 1 Op. O.L.C. 16, 17 (1977). Less certain is whether the White House Office is an "agency"—a term that section 3110 defines to include an "Executive agency," thereby calling up the definition of "Executive agency" generally applicable to title 5, *see* 5 U.S.C. § 3110(a)(1)(A); *id*. § 105. But whether or not the White House Office meets this definition (a subject to which we will return in Part II, *infra*), we believe that the President's special hiring authority in 3 U.S.C. § 105(a) permits him to make appointments to the White House Office that the anti-nepotism statute might otherwise forbid.

Section 3110 prohibits the appointment of certain persons to positions of employment in the federal government. It is therefore a "provision of law regulating the employment . . . of persons in the Government ser-

vice."[1] Under section 105(a), the President can exercise his authority to appoint and fix the pay of employees in the White House Office "without regard to" such a law. 3 U.S.C. § 105(a)(1). This authority is "[s]ubject" only to the provisions of subsection (a)(2), which limit the number of White House employees the President may appoint at certain pay levels. *See id*. § 105(a)(2). Thus, according to the most natural and straightforward reading of section 105(a), the President may appoint relatives as employees in the White House Office "without regard to" the anti-nepotism statute.

This reading of the two statutes gives section 105(a) a meaning no more sweeping than its words dictate. The ordinary effect of "without regard" language is to negate the application of a specified class of provisions. In *American Hospital Association v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987), for example, the D.C. Circuit declared that the "plain meaning" of a "without regard" exemption, which there enabled the Secretary of Health and Human Services ("HHS") to carry out his contracting authority "without regard to any provision of law relating to the making, performance, amendment or modification of contracts of the United States," was "to exempt HHS from . . . the vast corpus of laws establishing rules regarding the procurement of contracts from the government," although not from the requirements of the Administrative Procedure Act. *Id*. at 1054; *see also Friends of Animals v. Jewell*, 824 F.3d 1033, 1045 (D.C. Cir. 2016) (holding that a statutory direction to issue a rule "without regard to any other provision of statute or regulation that applies to issuance of such rule" effectively changed the Endangered Species Act); *Alliance for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174–75 (9th Cir. 2012) (reaching the same conclusion about a direction to issue a rule "without regard to any other provision of statute or regulation"); *cf. Crowley Caribbean Transport, Inc. v. United States*, 865 F.2d 1281, 1282–83 (D.C. Cir. 1989) (noting, in interpreting an authorization to the President to take certain action "notwithstanding any other provision of this chapter or any other Act," that a "clearer statement is difficult to imagine," and declining to "edit" the language to add an implied exemption).

---

[1] Subsection (c) of section 3110, which states that an individual appointed, employed, promoted, or advanced in violation of the statute's prohibition is "not entitled to pay," 5 U.S.C. § 3110(c), may also make section 3110 a "provision of law regulating the . . . compensation of persons in the Government service" rendered inapplicable by section 105(a).

Applying the "without regard" language, our Office has interpreted section 105(a) as a grant of "broad discretion" to the President "in hiring the employees of [the White House Office]"; the provision, we have said, "reflect[s] Congress's judgment that the President should have complete discretion in hiring staff with whom he interacts on a continuing basis." *Applicability of the Presidential Records Act to the White House Usher's Office*, 31 Op. O.L.C. 194, 197 (2007); *see also* Memorandum for Bernard Nussbaum, Counsel to the President, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Presidential Authority under 3 U.S.C. § 105(a) to Grant Retroactive Pay Increases to Staff Members of the White House Office* at 2–3 (July 30, 1993) (section 105(a)'s "sweeping language" gives the President "complete discretion" in adjusting pay of White House Office employees "in any manner he chooses"). That congressional intent is manifest in the House and Senate committee reports accompanying the 1978 legislation by which Congress enacted section 105(a). *See* Pub. L. No. 95-570, 92 Stat. 2445 (1978). Both reports state that the language "expresses the committee's intent to permit the President *total discretion in the employment*, removal, and compensation (within the limits established by this bill) *of all employees in the White House Office*." H.R. Rep. No. 95-979, at 6 (1978) (emphasis added); S. Rep. No. 95-868, at 7 (1978) (same). Aside from the reference to the compensation limits in subsection (a)(2), that statement is qualified only by the committees' explanation that section 105(a) "would not excuse any employee so appointed from full compliance with all laws, executive orders, and regulations governing such employee's conduct while serving under the appointment." H.R. Rep. No. 95-979, at 6; S. Rep. No. 95-868, at 7 (same).

One piece of section 105(a)'s legislative history does point the other way. During the House subcommittee hearing, the General Counsel to the President's Reorganization Project at the Office of Management and Budget ("OMB") testified that the language exempting the White House Office (along with other entities in the Executive Office of the President) from the usual rules on hiring and compensation "would not exempt [these entities] from the restrictions under the nepotism statute because of the specific provisions of that act which apply to the President." *Authorization for the White House Staff: Hearings Before the Subcomm. on Employee Ethics and Utilization of the H. Comm. on Post Office and Civil Service*, 95th Cong. 20 (1978) ("*Authorization for the White House*

*Staff* ") (testimony of F.T. Davis, Jr.). Even if we were prepared to reach a different understanding of section 105(a)'s text based on a single witness statement, *but see S&E Contractors, Inc. v. United States*, 406 U.S. 1, 13 n.9 (1972) ("In construing laws we have been extremely wary of testimony before committee hearings[.]"), this particular statement does not offer a persuasive basis on which to do so. Although no member of the subcommittee disputed the OMB official's interpretation, it is far from clear whether the members (and later, the authors of the House and Senate reports) ultimately endorsed his view about the language. The OMB official offered his interpretation after the subcommittee chair asked about the language's effect on a number of federal laws and authorities, including "the Hatch Act, nepotism law, criminal conflict of interest laws, [and] Executive Order 11222 regulating employee conduct"; the chair explained that she was asking in order to draft the committee report. *Authorization for the White House Staff* at 20 (question of Rep. Schroeder). But while another of the witness's assertions ultimately made it into the committee reports—his statement that the language would not affect any laws "dealing with conduct by public officials once they are appointed," *id.* (testimony of Mr. Davis), *see also* H.R. Rep. No. 95-979, at 6; S. Rep. No. 95-868, at 7—his comment about the anti-nepotism statute did not. *Cf. Gustafson v. Alloyd Co.*, 513 U.S. 561, 580 (1995) ("If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating."). Moreover, the rationale the OMB official offered for his interpretation—that "specific provisions" of section 3110 "apply to the President"—is not particularly convincing. Because the President exercises "jurisdiction or control" over the entire Executive Branch, section 3110, by its express terms, would seemingly apply to the President's filling of numerous positions in federal agencies, even if the "without regard to any other provision of law" language carved out a handful of entities in the Executive Office of the President, such as the White House Office. *Cf. Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 905 (D.C. Cir. 1993) ("*AAPS* ") (suggesting a reading of section 3110 under which "a President would be barred from appointing his brother as Attorney General, but perhaps not as a White House special assistant").

In our view, therefore, section 105(a) exempts presidential appointments to the White House Office from the scope of the anti-nepotism statute.

## II.

*Haddon v. Walters*, 43 F.3d 1488 (D.C. Cir. 1995) (per curiam), also bears on the question here and might appear to resolve it, albeit through a different route. Relying on arguments that would apply equally to the White House Office, *Haddon* held that the Executive Residence at the White House is not an "Executive agency" within the title 5 definition. *Id.* at 1490. Because the prohibition in section 3110 applies, as relevant here, only to appointments in "Executive agenc[ies]," *Haddon* seems to compel the conclusion that the bar against nepotism would not extend to appointments in the White House Office. Reinforcing this conclusion, though resting on other grounds, an earlier opinion of the D.C. Circuit had expressed "doubt that Congress intended to include the White House" as an "agency" under section 3110. *AAPS*, 997 F.2d at 905; *but see id.* at 920–21 (Buckley, J., concurring in the judgment) (disputing that interpretation of "agency").

The matter, however, is somewhat more complicated. Not every part of the reasoning in *Haddon* is entirely persuasive, and the court's rationale extends more broadly than necessary, in our view, to address the question now at hand. Nonetheless, we believe that *Haddon* lends support to our conclusion that the President may appoint relatives to positions in the White House Office.

*Haddon* held that the Executive Residence, which like the White House Office has a staff appointed under title 3, *see* 3 U.S.C. § 105(b), is not an "Executive agency" within the title 5 definition. *Haddon* was considering 42 U.S.C. § 2000e–16, which extends the antidiscrimination provisions of Title VII of the Civil Rights Act of 1964 to employees or applicants for employment "in executive agencies as defined in [5 U.S.C. § 105]." 42 U.S.C. § 2000e–16(a). Under that definition (the same one that governs section 3110), an "Executive agency" means "an Executive department, a Government corporation, and an independent establishment." 5 U.S.C. § 105. Because the Executive Residence, like the White House Office, is plainly not an "Executive department" or a "Government corporation," *see id.* §§ 101, 103, the issue in *Haddon* came down to whether the Executive Residence is an "independent establishment," *see id.* § 104.

The D.C. Circuit had two reasons for concluding that the Executive Residence is not an independent establishment and therefore not an Executive agency under 5 U.S.C. § 105. First, the court observed that another

statute, 3 U.S.C. § 112, authorizes "[t]he head of any department, agency, or independent establishment of the executive branch of the Government [to] detail, from time to time, employees of such department, agency, or establishment to the White House Office, the Executive Residence at the White House, the Office of the Vice President, the Domestic Policy Staff, and the Office of Administration." In the court's view, this phrasing suggested that the listed entities in the Executive Office of the President are not themselves "department[s], agenc[ies], or independent establishment[s]." *Haddon*, 43 F.3d at 1490 ("That Congress distinguished the Executive Residence from the independent establishments, whatever they may be, suggests that Congress does not regard the Executive Residence to be an independent establishment, as it uses that term."). Second, the court said that title 5 of the U.S. Code "relates to government organization and employees and prescribes pay and working conditions for agency employees," while title 3 of the Code "addresses similar concerns with respect to the President's advisors and the staff of the Executive Residence." *Id.* The incorporation of the title 5 definition in section 2000e–16, the court explained, suggests that Congress intended the statute to cover only "title 5" positions—not positions provided for in 3 U.S.C. § 105 and other title 3 authorities. *Id.*[2]

The D.C. Circuit's first reason may be the less convincing of the two. The wording of the detail statute, 3 U.S.C. § 112, "distinguish[es]" between the sending and receiving entities only insofar as the sending entities are identified generically, while the small group of entities that may receive details, including the Executive Residence and the White House Office, are specifically named. This wording might well be an apt way to authorize a detail without implying anything about the status of the receiving entities. Indeed, Congress elsewhere used similar constructions to provide for transfers between executive departments. Section 2256 of title 7, U.S. Code, declares that the "head of any department" may "transfer to the Department [of Agriculture]" funds to perform certain inspections, analyses, or tests. Similarly, under 22 U.S.C. § 2675, the Secretary of State may "transfer to any department" certain "funds appropriated to

---

[2] Shortly after *Haddon*, Congress passed the Presidential and Executive Office Accountability Act, Pub. L. No. 104-331, 110 Stat. 4053 (1996), which expressly applies Title VII and other federal civil rights and workplace laws to entities in the Executive Office of the President, including the White House Office and the Executive Residence. *See id.* § 2(a) (relevant provisions codified at 3 U.S.C. §§ 401, 402, 411).

the Department of State." The generic references to "departments" on one side of these transactions could not be read to imply that the entities on the other side, the Departments of Agriculture and State, are not "departments."

The court's second argument seems stronger, although the court stated it more broadly than the facts of *Haddon* required. The court apparently viewed the provisions in title 3 as creating a complete substitute for title 5: "while Title 5 relates to government organization and employees and prescribes pay and working conditions for agency employees, Title 3 addresses similar concerns with respect to the President's advisors and the staff of the Executive Residence." *Haddon*, 43 F.3d at 1490 (citation omitted). The court then quoted, in a parenthetical, the "without regard" provision for hiring in the Executive Residence that exactly parallels the one for the White House Office. *Id*. (quoting 3 U.S.C. § 105(b)(1)). Inasmuch as the plaintiff in *Haddon* claimed that he had been unlawfully passed over for promotion—that he had not been appointed to a higher position with higher pay—his claim had to do with exactly the subjects identified in 3 U.S.C. § 105(b)(1), "employment or compensation of persons in the Government service." Section 105(b)(1) could therefore be understood to displace the restrictions in Title VII, even if title 3 did not completely displace all of title 5. Thus, the court's broader statements about the relationship of title 3 and title 5, though not dicta, went further than necessary to decide the case and further than we need to go here.

In any event, our conclusion above—that the President's special hiring authority in 3 U.S.C. § 105(a) allows him to appoint relatives to the White House Office without regard to section 3110's bar against nepotism—is consistent with the holding in *Haddon* and with the court's reliance on the parallel language in 3 U.S.C. § 105(b)(1). In accordance with *Haddon*, we believe that the White House Office is not an "Executive agency" insofar as the laws on employment and compensation are concerned. Both the "without regard" language of section 105(a) and the general treatment of the White House Office under title 3 instead of title 5 undergird this conclusion.[3] Having conformed our analysis, to this extent, with the only authoritative judicial guidance bearing on this question, we have no need to delve into the issue whether the White House Office should be consid-

---

[3] We do not address the application of section 3110 to any other component of the government.

ered outside of title 5 for all purposes whenever the application of that title is confined to "Executive agenc[ies]."[4]

---

[4] We have observed before that the D.C. Circuit's reasoning in *Haddon* would seemingly extend to other entities listed in section 112 with special hiring authorities under title 3, including the White House Office. *See* Memorandum for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* at 18 (Sept. 17, 2009); *Application of 18 U.S.C. § 603 to Contributions to the President's Re-Election Committee*, 27 Op. O.L.C. 118, 118 (2003) ("Section 603 Opinion"). In one circumstance, however, because of features "unique" to the statutory scheme at issue—the Hatch Act Reform Amendments of 1993 ("HARA")—we have found that the White House Office should be treated as an "Executive agency" under title 5 notwithstanding *Haddon*. *See* Section 603 Opinion, 27 Op. O.L.C. at 119 (White House Office employees may make contributions to a President's authorized re-election campaign by virtue of an exception available to employees in an "Executive agency").

Section 603 of title 18 prohibits "an officer or employee of the United States or any department or agency thereof" from "mak[ing] any contribution . . . to any other such officer, employee or person . . . if the person receiving such contribution is the employer or employing authority of the person making the contribution." 18 U.S.C. § 603(a). But section 603(c) exempts from liability "employee[s] (as defined in section 7322(1) of title 5)"—meaning, employees subject to HARA. Section 7322(1), in turn, defines "employee" as "any individual, other than the President and the Vice President, employed or holding office in . . . an Executive agency." 5 U.S.C. § 7322(1)(A). Several considerations led us in our Section 603 Opinion to confirm a prior opinion treating the White House Office as an "Executive agency" for purposes of section 7322(1), *see Whether 18 U.S.C. § 603 Bars Civilian Executive Branch Employees and Officers from Making Contributions to a President's Authorized Re-Election Campaign Committee*, 19 Op. O.L.C. 103 (1995). First, there would be "no purpose" for section 7322(1)'s express exclusion of the President and the Vice President if they were not understood to be "holding office in . . . an Executive agency." Section 603 Opinion, 27 Op. O.L.C. at 119. Second, the exception to HARA's substantive prohibition on partisan political activity in 5 U.S.C. § 7324(b)(2)(B)(i) applies to "employee[s] paid from an appropriation for the Executive Office of the President," further reflecting HARA's assumption that such employees are otherwise covered. Section 603 Opinion, 27 Op. O.L.C. at 119. Third, reading section 7322(1) to exclude employees of the White House Office "might be thought to produce highly anomalous results," as it would follow that White House employees "would be entirely free from the restrictions of [HARA]" and "would be able to engage in all sorts of partisan political activity," including by "us[ing] [their] official authority or influence for the purpose of interfering with or affecting the result of an election," *see* 5 U.S.C. § 7323(a)(1). Section 603 Opinion, 27 Op. O.L.C. at 119. Thus, we determined that there are "powerful reasons to conclude that the term 'Executive agency' in section 7322(1) does not have the same meaning that section 105 of title 5 generally assigns it (and that cases like *Haddon* recognize) for the purpose of title 5." *Id.*

### III.

Our Office, on several occasions, has addressed the application of section 3110 to presidential appointments, including appointments to the White House Office and other entities within the Executive Office of the President. Although our conclusion today departs from some of that prior work, we think that this departure is fully justified. Our initial opinions on the subject drew unwarranted inferences about Congress's intent from a single witness statement in a congressional hearing. Moreover, the surrounding legal context has been transformed by the subsequent enactment of section 105(a), which expressly and specifically addresses employment within the White House Office, and also by the D.C. Circuit's decision in *Haddon*.

### A.

Section 3110 was enacted in 1967. In a 1972 memorandum, our Office concluded that the statute would bar the President from appointing a relative "to permanent or temporary employment as a member of the White House staff." Memorandum for John W. Dean, III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability to President of Restriction on Employment of Relatives* at 1 (Nov. 14, 1972) ("Cramton Memo"). The Cramton Memo is brief but unequivocal: section 3110, we said, "seems clearly applicable to . . . positions on the White House staff." *Id*. at 2.

In 1977, we advised that section 3110 would preclude the President from appointing the First Lady to serve as chair of the President's Commission on Mental Health ("Mental Health Commission"), whether with or without compensation. *See* Memorandum for Douglas B. Huron, Associate Counsel to the President, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Possible Appointment of Mrs. Carter as Chairman of the Commission on Mental Health* (Feb. 18, 1977) ("Mental Health Commission Memo I") (referencing attached Memorandum for John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the President's Appointing Mrs. Carter as Chairman of the Commission on Mental Health* (Feb. 17, 1977) ("Mental Health Commission Memo II")). We determined that the Mental Health Commission, which would be established by executive order and assigned specific authorities, would "clearly" qualify as an independent

establishment within the "comprehensive" meaning of that term. *Mental Health Commission Memo I*. Our analysis noted, however, that the funding for the Commission would come from an annual appropriation for the Executive Office of the President covering "Unanticipated Needs," and we accordingly considered the effect of language in that appropriation that, presaging section 105(a), authorized the President to hire personnel "without regard to any provision of law regulating employment and pay of persons in the Government service." *Mental Health Commission Memo II*, at 5–6. We ultimately concluded that the appropriation language did not override section 3110. Although we did not say that the Mental Health Commission would be located in the White House Office specifically, our analysis suggested that our conclusion about the appointment would have been the same, whether or not the position was located there. *See id*.

Shortly afterward, the White House asked us to answer that very question: whether section 3110 applied to the contemplated appointment of the President's son to serve as an unpaid assistant to a member of the White House staff. *See* Memorandum for the Attorney General from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Employment of Relatives Who Will Serve Without Compensation* (Mar. 23, 1977) ("White House Aide Memo I") (referencing attached Memorandum for John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of President's Son to Position in the White House Office* (Mar. 15, 1977) ("White House Aide Memo II")). The Civil Service Commission, the predecessor of the Office of Personnel Management, had advanced several arguments why section 3110 did not forbid the President's appointment of relatives to his personal staff. *See* White House Aide Memo I, at 1. Reaffirming the points made in the Mental Health Commission Memos, however, our Office concluded that the statute also covered the proposed appointment. Once again, we rejected an argument that the language in the annual appropriation for the White House Office (i.e., the "without regard" language) exempted those appointments from section 3110. White House Aide Memo II, at 1–3.

In 1983, we were asked whether the President could appoint a relative to a Presidential Advisory Committee on Private Sector Initiatives ("CPSI"). *See* Memorandum for David B. Waller, Senior Associate Counsel to the President, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of Member of President's Family to Presidential Advisory Committee on Private Sector*

*Initiatives* (Feb. 28, 1983). We answered that the President's proposed appointment of a relative to the CPSI raised "virtually the same problems raised by Mrs. Carter's proposed service on the President's Commission on Mental Health." *Id*. at 2. Because we lacked "sufficient time to reexamine the legal analysis contained in our earlier memoranda," we stated that we had no choice but to "adhere to the conclusion" that "the President cannot, consistently with section 3110, appoint a relative as an active member of such a Commission." *Id*.

Most recently, we advised whether the President could appoint his brother-in-law and his half-sister to two advisory committees. Once again, we found that section 3110 precluded the appointments. *See* Memorandum for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* (Sept. 17, 2009) ("Barron Opinion"). In the course of that analysis, we considered whether one of the committees, the President's Commission on White House Fellowships ("Fellowships Commission"), was located within the Executive Office of the President or was instead a free-standing establishment within the Executive Branch. *Id*. at 14–15.[5] Concluding that, either way, the Fellowships Commission was, or was within, an "independent establishment" falling within the title 5 definition of Executive agency, we did not decide the question. *Id*. But we explicitly rejected the possibility that the Fellowships Commission constituted a part of the White House Office. *Id*. at 14. As a result, the Barron Opinion had no occasion to reapply or reconsider our precedents finding that section 3110 barred the President from appointing relatives to White House Office positions. *See id*. at 18–19 (distinguishing *Haddon*).

## B.

Although none of our previous opinions analyzed the interaction between 3 U.S.C. § 105(a) and the anti-nepotism statute, our 1977 memo-

---

[5] We concluded that the other advisory committee at issue, the President's Council on Physical Fitness and Sports, constituted part of the Department of Health and Human Services. Barron Opinion at 9. Nothing in our present opinion should be understood to question our prior conclusions about filling positions not covered by the special hiring authorities in title 3.

randa did consider the effect of language in annual appropriations for the Executive Office of the President that was nearly identical to section 105(a). Prompted by the inconsistency between our earlier memoranda and the implications of *Haddon*, we now revisit the reasoning in those memoranda in order to assess the issue presented under section 105(a).

While acknowledging that the appropriation language was "broad" and the issue "not wholly free of doubt," our memorandum regarding the White House appointment reasoned that section 3110 should be understood as a "specific prohibition" constituting an "exception to the general rule that limitations on employment do not apply to the White House Office." White House Aide Memo II, at 3. We therefore invoked the "basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Id*. (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)). But the canon about general and specific statutes seems of limited help here, because neither of the two relevant statutes can readily be characterized as more or less specific than the other. To be sure, section 3110 could be said to concern the "specific" subject of nepotism. But section 105(a) could reasonably be described as a statute "dealing with [the] narrow, precise, and specific" subject of hiring for the White House Office that ought to overcome the generally applicable anti-nepotism rule of section 3110.

The 1977 memoranda also put significant weight on the legislative history of section 3110, discerning a clear congressional intent that the Executive Office of the President, including the White House Office, be among the entities subject to the anti-nepotism prohibition. *See* Mental Health Commission Memo I; Mental Health Commission Memo II, at 5; White House Aide Memo I, at 2; White House Aide Memo II, at 2–3. We think that this history is not so compelling, however, as to direct the outcome on the question here.

Section 3110 was enacted as part of the Postal Revenue and Federal Salary Act of 1967. *See* Pub. L. No. 90-206, § 221, 81 Stat. 613, 640. When Congress considered and passed the legislation, the annual appropriations for the Executive Office of the President then in effect included the permissive language about the President's authority to hire personnel in the White House Office. *See* Pub. L. No. 90-47, tit. III, 81 Stat. 113, 117 (1967). As our 1977 memoranda observed, there was no mention of those appropriations or that language during Congress's consideration of

the anti-nepotism provision. But one witness, the Chairman of the Civil Service Commission, testified before the Senate committee that, in his view, the language then under consideration would have prevented President Franklin Delano Roosevelt from appointing his son "at the White House as a civilian aide" (as President Roosevelt had done). *Federal Pay Legislation: Hearings Before the S. Comm. on Post Office and Civil Service*, 90th Cong. 366 (1967) ("*Federal Pay Legislation Hearings*") (testimony of Chairman Macy). Following the hearing, the Senate amended the provision in the bill and explicitly named the President as a "public official" to whom the bar applied. "Because the Senate Hearings contain the only extended discussion of the provision and the only discussion at all of its application to the President," we explained in our memorandum concerning the White House appointment, "it seems appropriate to attach particular significance to the Civil Service Commission's interpretation of the statute in the course of the hearings. It is reasonable to assume that the Senate Committee and eventually the Congress acted on the basis of Chairman Macy's interpretation of the prohibition as drafted." White House Aide Memo II, at 2.

Having reexamined the legislative materials, we no longer would make that assumption. The Senate committee and Chairman Macy were reviewing a version of the bill that prohibited nepotistic appointments to "department[s]," defined more broadly to include "each department, agency, establishment, *or other organization unit* in or under the . . . executive . . . branch of the Government . . . including a Government-owned or controlled corporation." H.R. 7977, 90th Cong. § 222 (as referred to S. Comm. on Post Office and Civil Service, Oct. 16, 1967) (emphasis added). It is unclear why the Senate amended the provision to apply instead to "Executive agenc[ies]" and thus to call up the title 5 definition of that term. *See* H.R. 7977, 90th Cong. § 221 (as reported out of S. Comm. on Post Office and Civil Service, Nov. 21, 1967). The Senate report does not explain the change. *See* S. Rep. No. 90-801, at 28 (1967). Nevertheless, that the Civil Service Commission Chairman was considering different statutory language when offering his view about the scope of the prohibition dilutes the strength of his testimony—which, as a witness statement, should typically be afforded less weight to begin with. *See S&E Contractors*, 406 U.S. at 13 n.9; *Gustafson*, 513 U.S. at 580.

Because the appropriation language was apparently never mentioned during the House's or Senate's consideration of the bill, the debates and

other materials include no clear statement that the anti-nepotism provision was intended to prevail over the broad hiring authority previously granted in that year's appropriation for the Executive Office of the President.[6] Moreover, aside from that single question about the service of President Roosevelt's son as a White House aide—which was part of a series of questions posed by the senators to Chairman Macy about the language's application to the President generally, *see Federal Pay Legislation Hearings* at 360–69—neither the Senate nor the House appears to have focused on the White House Office. We therefore are hesitant to infer that the 90th Congress envisioned that section 3110 would overcome the President's hiring authorities under the annual appropriation. We are even more reluctant to draw that inference with respect to the permanent special hiring authority for the White House Office that Congress enacted ten years later.

## IV.

Finally, we believe that this result—that the President may appoint relatives to his immediate staff of advisors in the White House Office—makes sense when considered in light of other applicable legal principles. Congress has not blocked, and most likely could not block, the President from

---

[6] Individual senators did stress the amended provision's breadth in floor statements. *See* 113 Cong. Rec. 36103 (1967) (statement of Sen. Randolph) (indicating that the Senate amended the provision "to plug any loopholes which might exist," because "[i]t was critical that the nepotism provisions be applied across the board"); *id.* (stating that "[w]e could not stop at a certain point in formulating a policy on nepotism" and "had to apply the policy across the board"); *id.* at 36103–04 (suggesting that "the White House believes, as does now the Congress, that a nonnepotism policy should apply equally to any branch of Government"); *id.* at 37316 (statement of Sen. Udall) (explaining that the provision applies "across-the-board, from the highest office to the lowest paid job, with equal force and effect" and that "[n]o official in any of the three branches of the Government . . . may appoint or promote a relative to any position under his or her control or jurisdiction," and calling it "the strongest possible guarantee against any abuse of Federal appointive authority and any preference in Federal positions that is adverse to the public interest"). These statements, whatever their worth in demonstrating congressional intent more generally, suggest that at least those senators meant for section 3110 to have broad effect across the three branches of government. But because those statements do not speak to section 3110's relationship to the President's hiring authority under the annual appropriations for the Executive Office of the President—and, of course, could not speak to the relationship between section 3110 and the later-enacted section 105(a)—they do not illuminate the matter at hand.

seeking advice from family members in their personal capacities. *Cf. In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005) (en banc) (referring to the President's need, "[i]n making decisions on personnel and policy, and in formulating legislative proposals, . . . to seek confidential information from many sources, both inside the government and outside"); *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 466 (1989) (construing the Federal Advisory Committee Act ("FACA") not to apply to the judicial recommendation panels of the American Bar Association in order to avoid "formidable constitutional difficulties"). Consequently, even if the anti-nepotism statute prevented the President from employing relatives in the White House as advisors, he would remain free to consult those relatives as private citizens. *See* Barron Opinion at 8–9 (finding the application of section 3110 to presidential advisory committees constitutional in part because "[t]he President remains free to consult his relatives in their private, individual capacities at the time and place of, and on the subjects of, his choosing"). And our Office has found that such an informal, "essentially personal" advisory relationship, even if the private person offers advice to the President on a "wide variety of issues," does not make that person an employee of the federal government subject to the conflict of interest laws in title 18. *Status of an Informal Presidential Advisor as a "Special Government Employee"*, 1 Op. O.L.C. 20, 20–21 (1977) ("*Informal Presidential Advisor*"); *see also id.* at 22 ("Mrs. Carter would not be regarded as a special Government employee solely on the ground that she may discuss governmental matters with the President on a daily basis.").[7]

But the conflict of interest laws do apply to employees of the White House Office. *See* 18 U.S.C. §§ 203, 205, 207, 208, 209 (all applicable to, *inter alia*, officers and employees in the "executive branch"); *id.* § 202(e)(1) (defining "executive branch" for purposes of those statutes to include "each executive agency as defined in title 5, and any other entity

---

[7] Our opinion explained, however, that while the informal presidential advisor's general practice (as we understood it) of discussing policy issues directly with the President did not itself render him a government employee, his more extensive "work" on a particular "current social issue"—in connection with which the advisor "called and chaired a number of meetings that were attended by employees of various agencies" and "assumed considerable responsibility for coordinating the Administration's activities in that particular area"—did cross a line and made him a government employee for purposes of that work. *Informal Presidential Advisor*, 1 Op. O.L.C. at 23.

or administrative unit in the executive branch"); *id*. § 207(c)(2)(A)(iii), (d)(1)(C) (applying more stringent post-employment restrictions to employees appointed to the White House Office pursuant to 3 U.S.C. § 105(a)(2)); *see also, e.g*., *Applicability of Post-Employment Restrictions in 18 U.S.C. § 207 to a Former Government Official Representing a Former President or Vice President in Connection with the Presidential Records Act*, 25 Op. O.L.C. 120 (2001) (considering section 207's application to former employees of the White House Office).

A President wanting a relative's advice on governmental matters therefore has a choice: to seek that advice on an unofficial, ad hoc basis without conferring the status and imposing the responsibilities that accompany formal White House positions; or to appoint his relative to the White House under title 3 and subject him to substantial restrictions against conflicts of interest. *Cf. AAPS*, 997 F.2d at 911 n.10 (declining, after holding that the First Lady qualifies as a "full-time officer or employee" of the government under FACA, to decide her status under the conflict of interest statutes). In choosing his personal staff, the President enjoys an unusual degree of freedom, which Congress found suitable to the demands of his office. Any appointment to that staff, however, carries with it a set of legal restrictions, by which Congress has regulated and fenced in the conduct of federal officials.

\* \* \* \* \*

In our view, section 105(a) of title 3 exempts appointments to the White House Office from the bar in section 3110 of title 5. Section 3110 therefore would not prohibit the contemplated appointment.

DANIEL L. KOFFSKY
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
